IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| DEBRA A. RHODES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-00551-CV-W-HFS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

I.     **Procedural Background**

On December 10, 1999, plaintiff applied for disability insurance benefits under Title II of

the Social Security Act, 42 U.S.C. §§ 401, et. seq. (Tr. 88-90), and on the same date, plaintiff

applied for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381,

et. seq. (Tr. 53-54). In both applications plaintiff claimed a disability onset date of September 2,

1999, due to bleeding and cramping, and alcohol recovery. (Tr. 76). Plaintiff's applications were

denied, and she timely requested a hearing. A hearing was held on June 15, 2001, before an

Administrative Law Judge "ALJ." By a decision dated October 26, 2001, the ALJ determined that

plaintiff suffered severe impairments including residuals or right foot surgeries; trochanteric bursitis;

a uterine fibroid condition; possible nerve root compression and osteoarthritis; substance abuse

disorder in early remission; and an adjustment disorder. (Tr. 16). However, the ALJ concluded that

plaintiff retained the residual functional capacity "RFC" to perform the full range of sedentary work.

(Id). Plaintiff requested review of this decision by the Appeals Council; the request was denied. (Tr. 3-5).

Plaintiff then requested review by this court in Case No. 02-286. However, on December 13, 2002, defendant filed a motion requesting that the ALJ's decision be reversed, and the case be remanded pursuant to sentence four of section 205(g), 42 U.S.C. § 405(g). Defendant explained that after reviewing the case, it requested that the Appeals Council reconsider the Commissioner's decision, and that upon review, the Appeals Council determine that remand was appropriate for further consideration of plaintiff's claim. Defendant requested that the ALJ be directed to reevaluate plaintiff's RFC; formulate a hypothetical question that included all of plaintiff's credible limitations and use vocational expert testimony in arriving at a determination as to whether plaintiff could perform her past work or other jobs existing in significant numbers in the national economy; and properly evaluate the effects of any drug or alcohol addiction on the issue of plaintiff's disability. (Tr. 394-97). By an order dated December 27, 2002, defendant's motion was granted pursuant to sentence four of 42 U.S.C. § 405(g).

On February 8, 2003, the Appeals Council remanded the case to an ALJ, and noted that because the opinions of Dr. Mary Brothers was given substantial weight, the conclusions made by the prior ALJ regarding plaintiff's RFC were not consistent with the evidence of record. (Tr. 399).The Appeals Council also noted that although the prior ALJ applied certain medical-vocational rules to direct a conclusion regarding the issue of disability, not all factors assumed under the rules were met. (Id).

On June 5, 2003, a hearing was held before another ALJ, and by a decision dated September 26, 2003, the ALJ found that plaintiff suffered from pelvic pain with abnormal bleeding associated

Case 4:05-cv-00551-HFS   Document 17   Filed 01/11/07   Page 2 of 21

with her menses; trochanteric bursitis with right hip pain; knee pain without an apparent cause; status post bunion surgery; and cocaine and alcohol abuse probably in remission since November 18, 1999. (Tr. 344). However, the ALJ concluded that plaintiff retained the RFC to perform her past relevant work as an assembler. Plaintiff sought review by the Appeals Council (Tr. 335-38); by a decision dated May 28, 2005, the request for review was denied (Tr. 332-34), thereby making the decision of the ALJ the final decision. For the reasons set forth herein, the decision of the ALJ is reversed.

## II.    Factual Background

### Hearing Testimony on June 15, 2001

At the time of this hearing, the ALJ noted that the last date insured was December 31, 2001. (Tr. 20). Plaintiff's counsel stated that x-ray evidence would show a damaged disk in plaintiff's lower back, degenerative arthritis in her right hip, and problems with 4 operations on her right foot. (Tr. 21). Counsel also stated that plaintiff needed to lie down frequently during the day due to severe pain, and had been depressed since abstaining from alcohol and drugs. (Id). Due to a combination of the physical and mental impairments, counsel did not believe plaintiff could sustain gainful employment. (Id).

### Plaintiff's Testimony

Plaintiff testified that she was 40 years of age, and lived alone in an apartment. (Tr. 22). She paid $14.00 a month for rent and her phone bill. (Id). She completed the 12th grade, and currently

Case 4:05-cv-00551-HFS    Document 17    Filed 01/11/07    Page 3 of 21

received a general relief check in the amount of $80.00, $130.00 in food stamps, and Medicaid benefits. (Tr. 23).

Plaintiff last worked in 1998 or 1999, at the Double Tree Hotel in the housekeeping department. (Tr. 23-24). Plaintiff only worked there a short time because she kept taking time off to receive medical treatment. (Tr. 24). When working, plaintiff took the bus; however, she paid someone to bring her to the hearing because her leg was too stiff to ride the bus. (Id). Due to surgery on her foot, she experiences pain up and down her right leg and hip. (Id). Plaintiff has had surgery 4 times on her foot. (Tr. 24-25). The first surgery was to remove a bunion, and a bone was cracked during surgery, so 2 pins had to be surgically placed in her foot. (Tr. 25). Then, one pin became dislodged and had to be removed. (Id). Plaintiff can not sit for long without getting up due to the pain in her hips and legs, which are as a result of her foot problems. (Id). Plaintiff also has back problems. (Id). Plaintiff cannot put too much pressure on her toe, and she has pain in the ball of her foot. (Tr. 26).

In 1998, plaintiff attended in-patient rehabilitation for drug and alcohol abuse; she relapsed 90 days after her attendance ended, but she has not used drugs or alcohol since that time. (Tr. 26). Plaintiff smokes 6 to 10 cigarettes a day. (Id). Plaintiff spends much of her day lying down to alleviate the pain in her foot. (Id). Plaintiff attends AA and NA meetings 3 to 4 times a month, and takes a bus to go grocery shopping. (Tr. 27). Plaintiff washes her laundry in the laundromat in her building, but when she doesn't have enough money, she washes her clothes in the kitchen sink. (Id).

Dr. Duff is plaintiff's gynecologist, and Dr. Alfred Caruso is her general practitioner. (Tr. 27-28). Plaintiff receives most of her medical care at Trinity Medical Center, and she attends the pain center at Research Medical Center. (Tr. 28). Plaintiff had physical therapy at Trinity for 6

4

months to manage her pain, but it increased her pain. (Tr. 28-29). Plaintiff takes Vicodin for pain, Flexeril as a muscle relaxant, Prenatal Plus vitamins due to blood loss, Ponzel to decrease menstrual bleeding, and Effexor for depression. (Tr. 29). Plaintiff does not experience any side effects from the medication. (Tr. 29-30).

The pain in her lower back radiates down her right leg to her foot. (Tr. 30). Plaintiff experiences pain in her back and leg almost every day, and described it as an 8 or 9, with 10 being the most painful. (Tr. 30-31). Plaintiff estimated that she can stand for 15 minutes, can walk about 1 block, and can only climb 7 or 8 steps. (Tr. 31). Plaintiff can lift and carry 10 pounds for 15 to 20 feet before increasing her pain. (Tr. 31). Plaintiff can sit for 10 to 15 minutes before needing to get up. (Tr. 32). Plaintiff has spasms in her back and right leg. (Id). In addition to attending physical therapy, plaintiff has used ice packs, hot water bottles, and back massagers in an attempt to alleviate her pain. (Id). Plaintiff also had epidural injections, but was unable to complete the regimen due to muscle spasms in her back. (Tr. 32-33).

Plaintiff lies down 3 to 4 times a day for 3 to 4 hours; she usually falls asleep if she has taken medication, i.e. Vicodin. (Tr. 33). Plaintiff's ankle, toes, and knee swells. (Id). In 1998, plaintiff began experiencing increased bleeding during her menstrual cycle. (Tr. 34). Initially, plaintiff was given a birth control shot but it caused excessive weight gain. (Id). Plaintiff presently takes Ponzel to control the bleeding, clotting, and cramps, but she does not feel it is working. (Id). Plaintiff gets her period 2 to 3 times a month. (Tr. 34-35). Plaintiff experiences cramps in her lower abdomen about 1 week before her period starts, her period lasts about 3 days, the cramping continues for another week. (Tr. 35). Due to the loss of blood, plaintiff feels tired most of the time. (Tr. 35-36). Plaintiff uses 48 sanitary napkins a month due to the heavy blood flow. (Tr. 36). Plaintiff has been

5

depressed since she ceased using drugs and alcohol. (Tr. 36). She also has crying spells and difficulty remembering things. (Tr. 37). Plaintiff attempted suicide before she started seeing a psychiatrist. (Tr. 38). Due to the depression, plaintiff's personal hygiene has decreased, and she was going through a divorce at the time of the hearing. (Tr. 39). Her daughter was 15 years of age and living with her father. (Tr. 39-40).

Plaintiff has a one bedroom apartment which she is able to maintain. (Tr. 40). Plaintiff arises at 6:00 a.m., watches television, and talks on the phone, she also attends church services on Sunday. (Tr. 40). Plaintiff no longer goes to the gym, rides a bike, or goes to the park. (Tr. 41). Plaintiff has 3 children, but none reside with her. (Id).

At the conclusion of the hearing, the ALJ stated that the record would remain open for 30 days so that plaintiff could submit additional medical records. (Tr. 41). Plaintiff would also be scheduled for evaluation by an orthopaedic physiatric. (Id).

As noted above, by a decision dated October 26, 2001, the ALJ determined that plaintiff suffered severe impairments including residuals or right foot surgeries; trochanteric bursitis; a uterine fibroid condition; possible nerve root compression and osteoarthritis; substance abuse disorder in early remission; and an adjustment disorder. (Tr. 16). However, the ALJ concluded that plaintiff retained the RFC to perform the full range of sedentary work. (Id). Inasmuch as this decision was subsequently remanded by motion of defendant, plaintiff does not challenge the October 26th decision.

It is noted that upon remand, the Appeals Council found that because the opinions of Dr. Mary Brothers was given substantial weight, the conclusions made by the prior ALJ regarding plaintiff's RFC were not consistent with the evidence of record. (Tr. 399).The Appeals Council also

6

noted that although the prior ALJ applied certain medical-vocational rules to direct a conclusion regarding the issue of disability, not all factors assumed under the rules were met. (Id). Consequently, another hearing was held on June 5, 2003, before another ALJ.

## Hearing Testimony on June 5, 2003

Before eliciting testimony the ALJ noted that pursuant to the remand order, she was directed to re-evaluate plaintiff's RFC, take vocational expert testimony, and evaluate plaintiff's prior substance abuse. (Tr. 353-54). Plaintiff's counsel agreed that there was no contention that plaintiff's impairments met or equaled a listing; rather, the contention was that her impairments precluded substantial gainful activity. (Tr. 355).

### Plaintiff's Testimony

Plaintiff testified that she began losing time at work on or about September 2, 1999, due to pain in her abdomen, right hip, right knee, ankle, foot, and lower back. (Tr. 357-58). Plaintiff completed the 12th grade, and attained a license as a certified nurse's aide "CNA," and attended beauty school for a period of time, but did not graduate. (Tr. 358). Plaintiff does not drive and does not have a drivers license; her prior license was revoked for driving without insurance. (Tr. 359). Plaintiff lives alone. (Id).

Plaintiff has difficulty standing and walking due to pain. (Id). Plaintiff estimated that she could stand for 20 to 30 minutes before she needs to sit down, and she can sit for 15 to 20 minutes before she needs to get up. (Tr. 360-61). She uses a cane. (Tr. 360). Plaintiff can lift 10 to 20 pounds, and she can bend, squat, and climb stairs. (Tr. 361). Plaintiff experiences weakness in her right leg,

7

hip, and lower back. (Tr. 362). Plaintiff awakens at 6:00 a.m., does a few household chores, and goes downstairs to the lobby to check the list of activities for the day. (Tr. 352-63). Activities include going to a show, or watching movies in the lobby. (Tr. 363). Plaintiff washes dishes, cleans, and visits with family and friends. (Id). Sometimes plaintiff's daughter visits with her and they participate in aerobic exercises in the lobby. (Id).

In November of 1999, plaintiff admitted herself into rehabilitation for cocaine and alcohol abuse. (Tr. 364). She relapsed on alcohol, but at the time of the hearing, had not had a drink for 2 years. (Id). Plaintiff takes Tramadol for pain, an iron supplement, and Vioxx. (Tr. 364-65). Plaintiff also takes Medroxprogesterone to decrease the vaginal bleeding. (Tr. 365).

When questioned by her attorney, plaintiff testified that she was 42 years of age, and received general relief in the amount of $70.00 monthly, and $35.00 a month in food stamps. (Tr. 366). She lives in public housing building designated for disabled persons, and pays $14.00 a month for rent. (Id). Plaintiff previously took Vicodin for pain and Flexeril; her current medications cause her to have a loss of memory and drowsiness. (Tr. 367). Plaintiff had 4 surgeries on her right foot, no hardware is currently in her foot. (Id). The lower back pain radiates into her right leg, sometimes accompanied by muscle spasms which generally occurs at night when she sits or lies down after being active. (Tr. 368). Plaintiff has tried physical therapy, warm baths, and ointment to alleviate the pain. (Id).

Plaintiff sometimes bleeds for 30 days; she previously had DepoProvera injections to decrease the bleeding but there was significant weight gain. (Tr. 369). Plaintiff also has severe cramping which sometimes requires an injection of Demerol. (Tr. 369-70). Plaintiff also has blood clots the size of her fist. (Tr. 370). Plaintiff has used 36 to 48 sanitary napkins in a 48 hour period

8

due to excessive bleeding; sometimes plaintiff has to change her clothing 3 to 4 times a month due to soiling. (Tr. 371). Plaintiff explained that she was unable to meet with the ALJ on the prior day because she had to return home to change her clothes after soiling them, and she was in severe pain. (Tr. 372). Plaintiff feels fatigued and dizzy due to the excessive blood loss. (Id). Plaintiff has spoken with her doctors regarding a surgical solution, i.e. hysterectomy, but nothing has been scheduled. (Tr. 373). Plaintiff later explained that due to her age the doctors felt she would soon enter menopause and the bleeding would subside on its own. (Tr. 375).

Plaintiff gets depressed and cries, and she also gets nervous, and her personal hygiene declines. (Tr. 373-74). Sometimes plaintiff leaves food cooking on the stove, drowsiness, and gets nervous when around people outside of her apartment complex. (Tr. 374). Plaintiff was scheduled for a hysteroscopy at K.U. Medical Center, but the medical center refused to accept Medicaid. (Tr. 376). Plaintiff has had numerous pelvic ultrasounds at Truman Medical Center and Trinity Family Medicine Center. (Tr. 376-77).


Medical Expert Testimony

Medical expert, Dr. Selbert E. Chernoff, described plaintiff's impairments as pelvic pain and menorrhagia (abnormal bleeding). (Tr. 378). Dr. Chernoff found that the Dep-Medrol injections provided plaintiff relief, and did not find that it produced a significant weight gain. (Id). He was unsure of the relevance of a hysteroscopy which simply provides a way to view within the uterus with a scope; he felt that since plaintiff was beyond child-bearing age the uterus should have been removed. (Id).

Dr. Chernoff found that plaintiff had documented pain in her right hip in June of 2000, diagnosed as trochanteric bursitis and received treatment. (Tr. 379). Dr. Chernoff described it as a bursa on the projecting part of the hip that can get inflamed, but it is not a part of the weight-bearing apparatus; thus, while it can produce pain when the leg is moved, it does not affect standing. (Id). An MRI taken in August of 2000, did not reveal any reason for the pain in plaintiff's knee. (Id).

Dr. Chernoff recounted the consultative examination performed by Dr. Brothers in August of 2001, and noted the bunion surgery in 1988, with some weakness of the extensors of the right foot with probable osteoarthritis of the hip. (Tr. 380). Dr. Chernoff also noted that there was a slight weakness of the right quadriceps as compared to the left, and the great toe extensors were very weak on the right. (Id). Although plaintiff could be diagnosed with probable osteoarthritis of the hip, x-rays taken of that hip in May of 2000, were normal. (Id). Dr. Chernoff stated that while plaintiff has trochanteric bursitis with a history of surgery on the right foot involving a bunion, that was usually not a big problem. (Id). Dr. Chernoff opined that the skeletal parts of plaintiff's pain were not substantiated. (Id). As to the pelvic pain, Dr. Chernoff stated that bleeding, dysmenorrheal with fibroids was not uncommon, and regular medicines usually helped. (Id). He further noted that Tramadol was not a very strong medicine and has a fairly long delay of onset. (Id).

Plaintiff interjected and explained that she has to take 2 tablets, and it became necessary to take her off of Vicodin because it was habit-forming. (Id). Dr. Chernoff noted that notes from her physicians indicated a suspicion that plaintiff was looking for drugs, and therefore, codeine, Vicodin, and hydrocodone would be limited. (Tr. 381). Again, plaintiff interjected. She agreed that certain medications were limited due to her prior drug addiction, but when taking Vicodin, she needed to take 2 tablets. (Id).

10

Dr. Chernoff felt that pain while menstruating was quite legitimate, but not when menstruation was not present because fibroids, in and of themselves, are not painful. (Tr. 381). Further, there was no evidence of endometriosis which can cause chronic pain, with or without menstruation. (Tr. 381-82). Although there was an initial consideration of depression, plaintiff was not taking any psychotropic medication and received no recent treatment. (Tr. 382).

Based upon his education, training, experience, and review of the medical records, Dr. Chernoff estimated that due to pain in her right hip, plaintiff could stand and walk for 2 hours. (Tr. 382). There would be no limitation on sitting or lifting, and plaintiff could occasionally stoop, squat, twist, and climb when not menstruating. (Tr. 382-83).

When questioned by counsel, Dr. Chernoff recognized Dr. Brothers's diagnosis of metromenorrhea, described as heavy and irregular bleeding, but noted that the diagnosis was made during a visit. (Tr. 383). Dr. Chernoff then agreed that plaintiff's irregular cycles were evidenced in the record, and that due to the pain, plaintiff would probably miss 1 to 2 days a month from work. (Id). Counsel also noted that Dr. Brothers opined that plaintiff would need to lie down when having pelvic pain on an as needed basis. (Tr. 384).

When questioned by the ALJ, Dr. Chernoff again noted that the record did not indicate a significant weight gain when plaintiff received Depo-Medrol injections. (Tr. 384). Plaintiff protested this finding, but Dr. Chernoff stated that while the injections can cause emotional disturbance on occasion, there was no evidence that plaintiff experienced it. (Id).

Counsel then questioned plaintiff who stated that she weighed 125 pounds when the injections began, and she gained 30 to 35 pounds. (Tr. 385). The weight gain caused pain in her right leg, and swelling in her hip and knee, and Dr. Cooper at K.U. stopped the injections. (Id). Within

11

the last 4 years, plaintiff estimated that her shortest menstrual cycle was 1 day, and the longest was 35 days. (Tr. 386). On average, her cycle lasts 2 to 3 weeks. (Id). During that time she lies down during the day for most of the day. (Id).


Vocational Expert Testimony

The vocational expert testified that plaintiff worked off and on as a housekeeper, which is unskilled, performed at a medium exertional level, but performed by plaintiff at the light level. (Tr. 388). In 1997 and 1998, plaintiff worked as an assembler which is an unskilled position performed at a light exertional level. (Id). In 1991, 1994, and 1998, plaintiff worked as a CNA which is semi-skilled and very heavy. (Id).

The ALJ asked the vocational expert to assume a person of plaintiff's age, education and work experience who could stand and walk 2 hours a day; with no limitation in lifting; and occasionally twist, stoop, squat, and climb, but not much during her menstrual period. (Tr. 388). The vocational expert opined that such an individual could perform plaintiff's past work as an assembler performed with a sit/stand option, i.e. a bench assembler. (Tr. 388-89). There were 5,00 bench assembler positions in Missouri, and 160,000 in the national economy. (Tr. 389). Additionally, the hypothetical person could perform work in the sedentary, unskilled capacity such as cashier, electronic assembler and telephone solicitor. (Id). There were 11,700 cashier jobs in Missouri, and 575,000 in the national economy; there were 7,500 jobs for electronics assembler in Missouri, and 85,000 nationally; and 8,000 jobs for telephone solicitor in Missouri, and 72,000 nationally. (Id). These jobs afford an employee a mid-morning and mid-afternoon break for 10 to 15 minutes, and a ½ hour lunch. (Id). However, there were no jobs that would allow an employee to lie down other

12

than during the breaks. (Tr. 390).When questioned by counsel, the vocational expert testified that most jobs permit an employee to miss 5 days a year, this could be 5 days of vacation time and 5 days of sick time. (Id). However, most unskilled positions would not permit an absence of 12 to 24 days a year. (Id).

In a decision dated September 26, 2003, the ALJ found that plaintiff suffered impairments including pelvic pain with abnormal bleeding, associated with her menses; trocanteric bursitis with right hip pain; knee pain without an apparent cause; status post bunion surgery; and cocaine and alcohol abuse, probably in remission since November 18, 1999. (Tr. 344). The ALJ found that plaintiff's depression was not severe for 12 months or more. (Id). The ALJ found that, based on the medical evidence and medical source opinions, plaintiff's allegations of pain were less than credible. (Tr. 348). The ALJ adopted the RFC as set forth by Dr. Chernoff and Dr. Brothers, and determined that plaintiff could perform her past relevant work as a bench assembler. (Tr. 348-49).

### III. Standard of Review

On review, this court must determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000). Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion. Id. In considering whether existing evidence is substantial, evidence that detracts from the Commissioner's decision as well as evidence that supports it must be considered. Craig, at 436. The Commissioner's decision may not be reversed merely because substantial evidence exists in the record that would have supported a contrary outcome. Id.

13

IV. **Analysis**

Plaintiff claims that the ALJ erred in finding that she could perform her past relevant work as a bench assembler, and that the hypothetical posed to the vocational expert was improper since it was based on an RFC not supported by substantial evidence. It is noted that prior to determining whether plaintiff could perform past work, and the hypothetical to be posed to the vocational expert, the ALJ was required to render a finding as to plaintiff's RFC, i.e. what plaintiff could do despite her impairments. It is further noted that pursuant to defendant's motion to remand, the ALJ was directed to re-evaluate plaintiff's RFC, formulate a hypothetical question which included all of plaintiff's credible limitations, and to use vocational expert testimony in determining whether plaintiff could perform past relevant work, or any work existing in significant numbers[1]. (Tr. 392-93, 399-400). Thus, review of the ALJ's finding as it relates to plaintiff's RFC would be appropriate.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities. Brinegar v. Barnhart, 358 F.Supp.2d 847, 857 (E.D.Mo. 2005). The determination of residual functional capacity is a medical issue, which requires consideration of supporting evidence from a medical professional. Brinegar, at 857. However, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); see also, Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (where objective

---

[1]The ALJ was also directed to evaluate the effects of plaintiff's drug and/or alcohol addiction upon her ability to be gainfully employed. However, the ALJ found that plaintiff's substance abuse was in early remission and caused no more than a moderate restriction of daily activities and social functioning. (Tr. 14). Moreover, since the ALJ found that plaintiff was not disabled there was no need to consider whether substance abuse was a material factor in a finding of disabled. (Tr. 15).

I find that the record supports the ALJ's finding in this matter, and that the record does not evidence any significant impact on plaintiff as it relates to her prior substance abuse. Plaintiff also does not cite any error by the ALJ in this respect.

14

evidence does not fully support the degree of severity in a claimant's subjective complaints of pain, the ALJ must consider all evidence relevant to those complaints). In making a credibility finding regarding a claimant's subjective allegations of pain, the ALJ is required to consider observations by third parties and treating and examining physicians relating to the plaintiff's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

In this regard, the ALJ found that plaintiff lacked credibility about her subjective allegations of pain. In support of this finding, the ALJ noted that plaintiff was able to perform household chores, participated in aerobics, played games, watched movies, and visited friends and family. (Tr. 348). Contrary to the ALJ's determination, these kind of activities do not necessarily equate to an ability to perform substantial gainful employment. The important issue is whether plaintiff has the ability to do the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. Forehand v. Barnhart, 364 F.3d 984 (8th Cir. 2004); see also, Gillette v. Barnhart, 291 F.Supp.2d 1071, 1078 (D.N.D. 2003) (light housework does not comport with full time competitive work).[2]

The ALJ also found that notwithstanding plaintiff's allegations, treatment was fairly conservative and her medication, Tramadol, was not a strong medication. (Tr. 348). The ALJ recognized, however, plaintiff's claim that Tramadol did not relieve her pain; yet, the ALJ then stated that notwithstanding plaintiff's claim of ineffectiveness, she did not request anything stronger.

_____

[2]While plaintiff's reference to aerobics is somewhat damaging to her claim, it is not necessary that she depict herself as a helpless hermit.

(Tr. 348). Yet, on October 8, 2001, the medical record indicates concern by plaintiff's physicians of drug seeking behavior. (Tr. 469). This concern was repeated on January 9, 2002. (Tr. 456). Hence, plaintiff apparently sought additional medication. The ALJ also noted that while the Depo Medrol injections relieved the abnormal bleeding, plaintiff reported a side effect of significant weight gain; but the ALJ concluded that the medical record did not evidence such a claim. (Tr. 345). In reaching this conclusion the ALJ relied on Dr. Chernoff's testimony that he could not find evidence of a weight gain in the medical record. (Tr. 384). Contrary to this finding however, examination notes of K.U. Medical Center reveal that plaintiff's weight in December of 1999, was 136 pounds, and on August 14, 2000, it was recorded at 163 pounds. (Tr. 253).

In assessing plaintiff's functional restrictions, the ALJ first considered plaintiff's claim of depression. A review of the record indicated that on November 3, 1999, plaintiff was admitted to Research Mental Health Services, and stated that she had abused crack cocaine daily for the past 7 years, and alcohol daily for the past 10 years. (Tr. 345). At that time plaintiff was diagnosed with cocaine and alcohol dependence and depressive disorder. (Id). Dr. Ronald Holzchuh examined plaintiff on January 6, 2000, and found no evidence of significant emotional or mental dysfunction. (Tr. 203, 345). His diagnosis included polysubstance abuse in early remission, and adjustment disorder with mixed disturbance of emotions in response to recovery process. (Tr. 204). During the early part of 2000, plaintiff continued to claim depression, but examinations did not reveal suicidal or homicidal ideation, and she was without psychosis; she was treated with Effexor. (Tr. 235, 346). The ALJ noted that there was further treatment, and at the time of the hearing, plaintiff was not taking any psychotropic medication. (Tr. 346). Plaintiff also testified that she had been sober for 1 to 2 years. (Tr. 346, 364). The ALJ found that plaintiff's depression was not severe when she is

16

sober, and that her substance abuse was probably in remission. (Tr. 346). The ALJ concluded that plaintiff's mental impairment resulted in no degree of limitation on her activities of daily living. (Id). The medical evidence provides substantial support for this finding.

The ALJ also considered plaintiff's physical impairments which included pain in the right hip, leg, knee, and foot, as well as heavy bleeding and severe cramping associated with menstruation. Medical notes in 2000, indicate that plaintiff had hip pain (Tr. 259), records dated May 23, 2000, indicate that although chronic, the hip pain was relieved with Vioxx. (Tr. 260). Notes from June 1, 2000, show a diagnosis of osteoarthritis treated with Flexeril, physical therapy was suggested to strengthen back muscles. (Tr. 267). On June 28, 2000, examination revealed tenderness over both trochanter bursitis. (Tr. 275). Notes during a follow up with plaintiff revealed the physician's impression of wide spread pain with no specific pain generator site, recommending continued use of Vicodin. (Tr. 281). Notes from a follow up with plaintiff on August 10, 2000, reveal that a recent MRI of the lumbosacral spine showed no evidence of herniated disc, spinal or foraminal stenosis; however, due to continued pain, plaintiff was scheduled for lumbar facet block. (Tr. 301).

In addition to these medical reports, the ALJ also considered the consultative report authored by Dr. Mary Brothers in which she found some lumbar scoliotic curvature and diffuse lumbosacral tenderness, greater at the trochanter of the right hip. (Tr. 320, 347). Plaintiff's upper extremities were unremarkable, but her knee had diminished flexion on the right with no significant redness or crepitus. (Tr. 321, 347). The right foot showed healed scars of the dorsal medial toe with no redness or infection, yet, there was very limited motion of the joints; plaintiff also had mild restricted motion of the right ankle. (Tr. 321, 347). Great toe extensors were less on the right foot than on the left foot.

Case 4:05-cv-00551-HFS   Document 17   Filed 01/11/07   Page 17 of 21

(Id). Dr. Brothers concluded that plaintiff had chronic right foot pain with a history of multiple surgeries, right hip pain associated with trochanteric bursitis, and probable osteoarthritis in the hips. (Tr. 323, 347). Dr. Brothers opined that plaintiff could not walk more than 1 hour at a time, or 4 to 5 hours in an 8 hour day. (Tr. 323). Plaintiff would require a cane during prolonged walking or on uneven terrain. (Id). She should avoid lifting in excess of 20 pounds; squatting, crouching and crawling were prohibited; and stair climbing should be minimized. Since Dr. Brothers found plaintiff to be unlimited in the use of her upper extremities she concluded that plaintiff could "do quite a bit of work with her hands," sit for 6 or more hours in a day, but would probably need to occasionally lie down when experiencing pelvic pain. (Id). Dr. Brothers recommended that plaintiff wear proper shoes with orthotics and water aerobics. (Tr. 323-24).

Other than the need to lie down because of pelvic pain, the above medical evidence and various reports weigh in favor of the ALJ's finding that even with certain physical impairments, plaintiff was capable of gainful employment within the sedentary range. Error occurred however, with the ALJ's finding that the heavy bleeding and severe cramps experienced during plaintiff's prolonged menstrual periods did not hamper her ability to engage in uninterrupted work.

The ALJ took note of Dr. Chernoff's testimony that while plaintiff's medication, Tramadol, was not particularly strong, plaintiff did experience pain when menstruating. (Tr. 345). The ALJ further noted that when questioned by counsel, Dr. Chernoff testified that due to the irregular bleeding, plaintiff could miss work. (Id). Dr. Chernoff admitted that the record substantiated that plaintiff experienced significant bleeding during menstruation, and, that even with medication, plaintiff could miss 1 to 2 days a month due to pain. (Tr. 383). The ALJ also took note of Dr. Brothers' diagnostic impression that plaintiff had an apparent uterine fibroid with dysmenorrhea and

Case 4:05-cv-00551-HFS   Document 17   Filed 01/11/07   Page 18 of 21

metromenorrhagia (heavy and irregular bleeding). (Tr. 347). The ALJ acknowledged this diagnosis in her decision. (Id).

The ALJ ultimately decided on an RFC believed to be consistent with Dr. Chernoff's hearing testimony and Dr. Brothers' evaluation. (Tr. 348). Thus, the ALJ found that plaintiff retained the RFC to stand and walk 2 hours a day; sit and lift without any limitations; and only occasionally twist, stoop, squat, and climb. (Id). When the hypothetical was posed to the vocational expert, incorporating this RFC, the vocational expert opined that such a person could perform plaintiff's past relevant work as a bench assembler.

It appears that the ALJ found the medical evidence provided by Dr. Chernoff and Dr. Brothers to be credible, except for that part of their opinions that plaintiff would miss 1 to 2 days a month from work, and would need to occasionally lie down due to the heavy and painful menstrual period. Yet, the ALJ is silent in her decision as to why she did not accept these portions of the opinions. While the ALJ's decision that plaintiff's ability to perform sedentary work may not be impeded by the bursitis in her hip, pain in her knee, or past substance abuse is supported by the evidence of record, substantial evidence supports a finding that due to menstrual pain, plaintiff will not be able to sustain acceptable attendance at work. Both physicians, upon whose opinions the ALJ relied, reported that plaintiff suffered from heavy bleeding and pain which could cause excessive absences from work, and a need to lie down outside of regular breaks, and there are no materials in the record to the contrary. The ALJ noted, and the record reflects that the cause of plaintiff's menstrual impairment has not been conclusively determined[3].

_____

[3]A pelvic sonogram on July 3, 2001, noted the presence of a uterine fibroid, but was essentially unremarkable. (Tr. 345, 484, 518). An ultrasound taken on January 28, 2003, reflected the presence of right ovarian cysts, but the ALJ also found it to be unremarkable. (Tr.

Case 4:05-cv-00551-HFS   Document 17   Filed 01/11/07   Page 19 of 21

Nevertheless, when the vocational expert was asked to consider a hypothetical person with a need to lie down or miss 1 to 2 days a month from work, the vocational expert testified that all gainful employment would be precluded. The hypothetical posed to the vocational expert excluding these restrictions failed to capture the concrete consequences of plaintiff's impairment, and was not based on the record as a whole. Therefore, the vocational expert's testimony that plaintiff could perform her past relevant work was not based on a properly phrased hypothetical and is not supported by substantial evidence. Meinders, at 1144. For employers are concerned with substantial capacity, psychological stability, and steady attendance.....Meinders v. Barnhart, 195 F.Supp.2d 1136, 1144-45 (S.D.Iowa 2002); quoting, Thomas v. Celebrezze, 331 F.2d 541, 546 (4th Cir. 1964).

It has been held that where, as here, the proof of disability is very strong, and there is no contrary evidence, a judicial award of benefits is proper. Meinders, at 1145. When the restrictions set forth by Drs. Chernoff and Brothers were put to the vocational expert, the testimony was that no work was possible. (Tr. 390). Thus, the only purpose served by still another remand would be to delay the receipt of benefits to which plaintiff is entitled. Hutsell v. Massanari, 259 F.3d 707, 714 (8th Cir. 2001); see also, Meinders, at 1145.

Accordingly, it is hereby

ORDERED that plaintiff's request for judgment is GRANTED, and the above captioned case is REMANDED to the Commissioner of Social Security for an award of benefits.[4]

---

345, 487). Yet, a diagnosis of menorrhagia is found throughout the medical records. (Tr. 434, 439, 441, 443, 451, 453, 455, 458, 465, 470, 472, 488, 495-96).

[4]It seems well worth noting that lifetime benefits are not contemplated. The menstrual problems are likely to cease (and perhaps have changed prior to this ruling). A cut-off of benefits may well occur when plaintiff becomes less physically vulnerable.

Case 4:05-cv-00551-HFS   Document 17   Filed 01/11/07   Page 20 of 21

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

January 11, 2007

Kansas City, Missouri